Good morning, Your Honors. Lou Diaz, appearing on behalf of the G.W. Palmer Appellants. Your Honors, I'd like to reserve four minutes for rebuttal. Watch the clock. Remember, it counts down. May it please the Court. The issue in this case, as framed by the District Court opinion, is whether this circuit in Boulder Fruit held that any commercially reasonable financing arrangement? Well, that's not the exact language of Boulder Fruit, is it? The exact language... Boulder Fruit says, Judge Silverman, I've re-read it several times, he talks about commercially reasonable sale. That is correct, Your Honor. And so, one question in my mind, and I think the central question for me in this case is, putting aside whether this arrangement is a sale or something else, have we adopted a commercially reasonable sale doctrine or a commercially reasonable commercial arrangement doctrine? In reviewing the Boulder Fruit opinion, the District Court misapprehended that opinion. I believe the Boulder Fruit case is limited to commercial reasonable sales of accounts receivable. That is the standard. The commercially reasonable standard is limited just to sales. Why is that? It's limited to sales because, under PACA, PACA applies specifically to secured lenders. Section 5c1 of the PACA explains the intent and the purpose of the PACA, and it really frames the issue before the court. That provision provides financing arrangements that encumber or give a security interest in produce, and any receivables or proceeds from the sale of produce are contrary to the public interest. It's dealing with security interests, not a sale. So, in your view, does the statute prohibit security interests that are subordinated to the growers' interests? It does not prohibit the granting of a security interest. However... Contrary to the public interest sounds like void language to me. It does, Your Honor. It does. Basically, it forbids a security interest in encumbering trust assets to the extent, such assets are unavailable to pay the produce suppliers and are freely available at all times to pay the produce suppliers. That's the only time it's forbidden. So, just so I understand, you agree, do you not, that if it's a security agreement, the secured lender is subordinate to the sellers under the... That is correct. ...under the statute. If it's a sale, and assuming it's a commercially reasonable sale of accounts receivable, that's fine, and that the buyer takes them free and clear of liens? That is correct. Okay. So, as a matter of securities law, UCC law, how does one sell an asset that has a lien against it free and clear of all liens? Well... What Boulder Fruit seems to say can be done. Tell me how that happens. What happens is, if a produce company sells an account receivable, the receivable is converted into cash, and it is removed from the trust, and the seller takes free of the trust so long as it pays commercially reasonable value. So, here we have, and let me restructure this deal just slightly for purposes of simplicity. We said in Boulder Fruit that if you sold it for 80%, that was commercially reasonable. Here, whether you call it a moment that the middleman gets 80% plus something else. So, are we going to say that's not allowed by the statute, but a deal that produced less for the growers is? No. I think it all hinges, and that's really the issue before us. Well, let's assume it's a loan for a moment. All right. If it's a loan, it's commercially unreasonable, because it can never be commercially reasonable, no matter what the terms are, if it's a loan, if they're taking the trust assets ahead of the pack of trust creditors. I think there's, you may be mixing two concepts. I'm not sure it matters, but every trustee must act in a commercially reasonable fashion. That is correct. Then we have a separate problem of the lien that attaches to these accounts receivable. So, in my mind, at least, I would first look at commercially reasonable to see whether it's a good deal. Now, the second question is still what happens to this lien, but whether you do it that way or some other way. Let's assume we have two transactions, the Boulder Creek transaction and this one, and let's call this one a loan for a moment. 80% comes in, remains with the middleman who passes it on to the growers, and then he's got a chance at getting some more later. That's better than the Boulder Creek deal. Why should we find that the statute prohibits that one, a statute designed to protect growers, while it allows the other one? That's because that's what Congress specifically was trying to prevent, was secured lenders from trumping the interest of the produce suppliers. It doesn't matter what the terms of the loan are. The bottom line is, the statute says that produce guys trump the interest of secured lenders. Now, what the district court did is said, hey, if the loan is commercially reasonable, then it trumps those of the pack of creditors. In other words, the district court created a commercially reasonable exemption, wrote in an exemption into the PACA statute that says, hey, PACA trust creditors, you don't trump the PACA trust creditors, you don't trump the secured lenders if that loan is commercially reasonable. If Congress wanted to put in a commercially reasonable exemption into the statute, it would have wrote it in, but it didn't. It wanted PACA trust creditors to always trump the interest of secured lenders as it relates to PACA trust assets. Now, let me ask you the $64 question or maybe the $220,000 question. I'm not sure how much is at issue in this case. How can I tell whether this is a loan or a sale? It has lots of language in the agreement saying it's a purchase agreement. It has lots of language that seems like the language that the Fourth Circuit talks about in its case that it characterized as a loan. Is this an ambiguous contract on which overall evidence is needed? How do I determine whether it's a loan or a sale? I think you need to look at the substance of the agreement. What did the agreement do? It was an agreement whereby you have to look at the transfer of risk. Did AGRICAP assume all the risk? Did it assume the risk that the receivable would be collected? But where does the concept of transfer of risk come from? The Fourth Circuit case? It comes from the Fourth Circuit case. It also comes from the Endico case. Those are the two opinions that address the issue of transfer of risk. Now if you look at the loan documents in this case, AGRICAP never assumed any of the risk. There was a paragraph, one of the main paragraphs of the financing documents that said that Tanimura, they would force Tanimura to charge back the receivables if AGRICAP did not collect it. The term sheet as part of the financing arrangement said that Tanimura was the borrower, AGRICAP was the lender. Now I assume the 20% was to account for the charge back. Plus the 20% hold back, I assume, was for the service fee, the interest rate, shall we call it that, and then some cushion for non-receivables that aren't collected. Is that right? charge back additional sums on top of the 20% in the event they didn't collect it. That's not an issue in this case, is it? A charge back? The 80% has already been paid out. But they could charge back even more. Theoretically, in some other case under this contract, they could. Hasn't the 80% already been paid out to the growers? It's paid, but it's subject to charge back by AGRICAP in the event they don't collect the receivable. Judge Gould has a question. Counsel, if I could interject a question. I didn't really understand your argument that AGRICAP is not subject to risk. If it pays out 80%, and then it can't recover from the creditor, from the account receivable, and then it goes to charge it back again to the distributor whose accounts they bought, that distributor could be gone or broke or bankrupt, and then wouldn't they be out their 80% to the extent they can't recoup it in a bankruptcy? To the extent they can't recoup it. However, here's what AGRICAP did. They also got personal guarantees from the principals of Tanimura. They also filed UCC1 statements on all the assets of the distributor. They made another bank subordinate their interest in the assets of Tanimura so that they would have a first priority, subject, of course, to the PACA trust claims. So no, they never assumed any of the risk. They protected themselves as much as they possibly could. If this were a true sale, AGRICAP would pay 80%, and they would bear the risk, and the borrower would be free to go on its way, and AGRICAP would be stuck with the risk of loss and the delay in collection. But that's not how it worked. Let me ask you a question about AGRICAP's fees. Its efforts produce these receivables, or at least, you know, collect the receivables. Is it your position that its fees are not collectible against the 20% retained? Nothing is collectible. They didn't do anything to collect the receivables other than put a stamp on the invoices and direct the produce buyers from Tanimura. Well, look, if it were that simple, the middleman would have collected 100% of the receivables. Obviously, the middleman thought there was some risk and that they weren't worth, you know, he couldn't get them all, and therefore, he sent them out to a factor to go collect. So your position is that even if the factor, by its efforts, produces some of these collections that might not have been produced otherwise, they can't take a fee for it? No, they can't, because the accounts receivable always remain trust assets subject to the claims of the Packet Trust creditors. It's always trust assets to which they prime the secured lender. Counsel, could I interject another question? Just in terms of the big picture, if we adopted the rule that your client is advocating, and we said before you get to the question of whether the sale is commercially reasonable, you need to have a separate inquiry on assumption of risk, whether it's really a sale or a loan, as what would be the consequences in the factoring industry? The consequences would be, in the factoring industry, they would have to stop. They'd have to make a decision. Are we truly going to buy these receivables and make a true factoring relationship like the court held in Boulder Fruit, the financing arrangements that's allowed, or are we still going to try to protect ourselves, pretend it's a sale, and really create a revolving line of credit? For the factoring industry, as the House report noted, when they passed the statute in 1984, this was known to the lending world. They knew they could adjust how they lend money to produce suppliers or receivers. So, Your Honor, in closing, I'd just like to say that Judge Wu, by refusing to analyze the substance of the documents in question here, created a commercially reasonable exemption to the packet, which is going to reduce it to a nullity. So what are you asking us to do? Are you asking us to remand it to the district court to analyze the documents? Yes, Your Honor. I would like it remanded to the district court with specific instructions to analyze whether this was a revolving line or was this a true sale, as it was in Boulder. Thank you. Mr. Eisenberg. Thank you, Your Honors. In Boulder Fruit, this court analyzed the exact question that it's presented with again today, and that is, very simply, if a produce beneficiary of the trust has already once received the benefits of a conversion of the receivable, can it then come back a second time and ask for the return of that receivable, in essence, expanding the trust from its original size for every dollar purchased or sold by them to TDI. They want $2 worth of protection. They want the dollar that was then, or the 98 cents in this case, that agri-cap paid to TDI that was then used to pay them, the beneficiaries, as the statute was intended, but they also want then agri-cap to return that dollar in receivable. Well, is that right? Or do they want the two cents? No. As I understand their position, they've got to lean against the receivables to the extent of the amount of money that the middleman owes them, right? No. They're not asking just for the two cents. Well, I know. I'm not asking. That's not what they're asking for. I want to understand what the law provides. Let's assume I'm the grower and I sell an apple to the middleman for a dollar, and the middleman sells it to the grocery store for $1.50. There's an account receivable of $1.50, right? Yes. As the grower, my lien is only $1, though, isn't it? Let's assume there's only one piece of fruit involved in this whole transaction. My lien is $1? It's not technically a lien, which is where I think it is. But your interest in the trust. My priority is $1? Yes. Okay, so tell me why they're asking for the $1.50 here. I don't understand that. Because what has happened is this is a series of transactions. So for that $1, they then have sold that TDI. TDI turns around and gets the $1.50 from the seller, or the supermarket in most cases. They take that $1.50 invoice, sell it to AgriCap. AgriCap pays them the $1.50 into an account that the TDI then uses to pay the beneficiaries of the Packet Trust. Let's track this apple through because I'm still having trouble. There's no judgment. Go ahead. You can help me out here. So we have this apple, one account. It's $1.00. $1.50 account receivable. Yes. At this point, nobody's collected the account receivable. So the middleman sells the account receivable to AgriCap and receives, sells or lends, let's put that aside for a second, and receives $0.80. $0.80 or $1.20? Which are the two? Is it 80% of the receivable? It's actually 98% of the receivable ultimately. That's because it's 80% of the $1.50? No, because for each receivable that AgriCap received, it paid $0.98. The dollar numbers here are the receivables. That's at the end of the day because of collections. No, that's – But it's initially 80% of $1.50, right? Technically, it's you pay 100% less the fees, which in this case averaged to be 2%. So $0.98 of every receivable was paid by AgriCap. Let me ask the question differently. What was paid at the – let's again, let's just take one number, the initiation of the deal. When the contract was signed, how much money was advanced to the middleman? Let's assume you had $1.50 in receivables. How much money would be advanced to the middleman at that point in time? It would be initially the 80% of the $1.50, but with the right to then collect the extra 20 less the fees, so the extra 18 cents. And just so that I'm clear here, the total amount of receivables that AgriCap received was $20.6 million, of which they paid $20.4 million to the middleman. Right. So – and I'm still – this may be just complete misunderstanding on my part, but bear with me on this. Once the growers have received 100 cents on the dollar of the debt from the middleman to the growers, you get to keep the rest under any scenario, correct? Once – I'm not sure I understood your question. Well, let me make it real simple. I'm a grower. I sold an apple to the middleman for $1. Once I get $1 back, everything extra you collect with respect to that apple remains in the factor's hands, correct? Yes. Okay. So I'm not sure I understood your position in the beginning about why they're seeking $2 on the dollar. They're seeking $1 on the dollar of the amounts owed them by the middleman, correct? Well, the monies that AgriCap paid to TDI were then used to pay off the prior invoices. I understand that at the end of the day they got 98 cents on the dollar. They're fighting about the two cents. You told me they're fighting about $1.02. I still don't understand why they're fighting about $1.02. Because not only did they receive the $20.4 million that AgriCap paid to TDI, that TDI then used to pay the beneficiaries of the trust, but they want the return of the receivables from AgriCap. So they're asking for the disgorgement, not just of the balance, but of the entire amount that AgriCap received or acquired. I won't ask them that when they stand up, but it seems to me then that no matter what the correct legal position in the case is, the remedy that you say they're seeking may be excessive. But the argument that you're making, it seems to me, is an argument with the statute. Let's put aside the argument of whether it's a factoring agreement. Let's just say you're bank A and TDI comes and says, I want to finance my business with a loan and I'm going to give you as collateral my accounts receivable. Now, the bank loans them a million dollars. Some of it hopefully goes to the growers. Some goes for utilities and other expenses. But that million dollars of accounts receivable, assuming it's still uncollected, is subordinate to the trust, isn't it? No, it is not, Your Honors. There are concepts that have been expressed that are not in the PACA regulations and law itself. The regulations and the law are precisely what this Court in Boulder Fruit looked to, which says there shall be no any transaction that dissipates trust assets is improper. Your position is that the Fourth Circuit is wrong. Oh, yes. But stay with us for a second and assume that the Fourth Circuit position is right. I understood that to be that you can have a lien against me.
judges: Gould, Hurwitz, Melloy